# District of Columbia
# Court of Appeals

**No. 14-CV-1069**

RICHARD C. BARTEL

Appellant,



FILED

DEC **24** 2015

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CAB-5798-13**

BANK OF AMERICA CORPORATION,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:  Thompson and McLeese, Associate Judges; and Steadman, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is reversed, and the case is remanded for further proceedings.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: December 24, 2015.

Opinion by Associate Judge Roy W. McLeese.

Dissenting opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 14-CV-1069

RICHARD C. BARTEL, APPELLANT,

v.

BANK OF AMERICA CORPORATION, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-5798-13)

(Hon. Neal E. Kravitz, Motions Judge)

(Argued June 3, 2015                    Decided December 24, 2015)

*Matthew August LeFande* for appellant.

*David M. Ross* for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and STEADMAN, *Senior Judge.*

Opinion for the court by *Associate Judge* MCLEESE.

Dissenting opinion by *Associate Judge* THOMPSON at page 17.

MCLEESE, *Associate Judge*: Appellant Richard C. Bartel sued appellee Bank of America Corporation, seeking to compel the Bank to honor a lost cashier's check. The trial court granted summary judgment to the Bank on the ground that

Mr. Bartel had failed to proffer admissible evidence from which a reasonable factfinder could find that the check has not already been paid. We reverse and remand for further proceedings.

## I.

In the trial court, Mr. Bartel alleged the following. In 1994, Mr. Bartel purchased a cashier's check in the amount of $30,761 from the Bank's predecessor in interest. The check was payable to "Dana McKinley or Edna McKinley or Richard Bartel." The check was intended to serve as consideration for a contemplated business transaction between Mr. Bartel and the McKinleys. Shortly after the check was issued, Mr. Bartel and Ms. McKinley placed the check in the McKinleys' fireproof safe, for safekeeping. The McKinleys agreed to hold the check until Mr. Bartel wanted to retrieve the check or request its return. The McKinleys decided not to go ahead with the contemplated transaction, but Mr. Bartel left the check with them in the hope that they might nevertheless come to an agreement.

The contemplated transaction never took place, and Mr. Bartel eventually made unsuccessful efforts to obtain the check from the McKinleys. Ms. McKinley,

who was blind and could not open the safe, died in 2008. Mr. McKinley, who had been appointed a guardian due to failing health, said that he no longer knew the correct combination to the safe. Mr. McKinley also said that he had not moved or touched the check and that the check had not been removed from the house.

In 2009, Mr. Bartel filed an action in Florida seeking to obtain possession of the check. When the safe was eventually drilled open, the check was not found inside. Mr. McKinley died in 2011. The check was not listed on the inventories prepared in connection with the McKinleys' estates. An inquiry into the McKinleys' financial records found no evidence of a deposit other than ordinary pension deposits. The check did not escheat to the State of Maryland and was not found in Maryland records of unclaimed property.

In 2013, Mr. Bartel filed a declaration of loss and demanded that the Bank pay the check. After the Bank refused to pay, Mr. Bartel filed suit in Superior Court. In pertinent part, Mr. Bartel sought relief under D.C. Code §§ 28:3-309 and -312 (2015 Supp.), which establish procedures by which a party can obtain payment of a lost cashier's check or other negotiable instrument. The trial court granted summary judgment to the Bank. Specifically, the trial court concluded that

Mr. Bartel had failed to carry his burden of offering admissible evidence that the check has not already been paid to someone entitled to enforce it.[1]

## II.

"To prevail on a motion for summary judgment, a party must demonstrate that there is no genuine issue of material fact and that [it] is entitled to judgment as a matter of law. This court's review of orders granting summary judgment is de novo, with the court conducting an independent review of the record and applying

---

[1] The trial court and the parties appear to have used the term "negotiate" to refer to the presentation of a cashier's check to the bank for payment. Strictly speaking, "negotiation" is the transfer of an instrument to another holder, which is distinct from presentation to the bank for payment. *See* D.C. Code § 28:3-201 (a) (2012 Repl.) (defining "negotiation"); D.C. Code § 28:3-501 (2012 Repl.) (defining "presentment"); D.C. Code §§ 28:3-602, -603 (2012 Repl. & 2015 Supp.) (discussing "payment"); *see generally, e.g.*, *Lawrence's Anderson on the Uniform Commercial Code* § 3-201:8, Westlaw (3d ed. database updated Dec. 2014) ("Presentment of an instrument for payment is not a negotiation of the instrument."). We decide in this opinion only the question whether Mr. Bartel bore the burden of proof on the issue of prior payment, concluding that he did not. Although some of the discussion in this opinion is potentially relevant to the related question whether Mr. Bartel bore the burden of proving that the McKinleys had not negotiated the check, i.e., transferred possession of the check to a holder, we choose to leave that question for the trial court to consider on remand. We also do not decide whether dismissal or summary judgment would be appropriate on other grounds not reached by the trial court, including laches as well as other statutory requirements under sections 28:3-309 and 28:3-312. Specifically, we do not decide the question whether, given that the Bank bears the burden on the issue of prior payment, the Bank nevertheless can demonstrate an entitlement to summary judgment on that issue.

the same substantive standard used by the trial court.  We construe the record in the light most favorable to the party opposing summary judgment." *Boyrie v. E & G Prop. Servs.*, 58 A.3d 475, 477 (D.C. 2013) (citations and internal quotation marks omitted).  Because we conclude that neither section 28:3-309 nor section 28:3-312 places on Mr. Bartel the burden of proving that the check has not already been paid, we reverse the grant of summary judgment.

We turn first to section 28:3-309.[2]  Under that provision, a person seeking payment of a lost instrument must demonstrate that he or she has the right "to

---

[2] Section 28:3-309 provides:

(a) A person not in possession of an instrument is entitled to enforce the instrument if:  (1) The person seeking to enforce the instrument:  (A) Was entitled to enforce the instrument when loss of possession occurred; or (B) Has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred; (2) The loss of possession was not the result of a transfer by the person or a lawful seizure; and (3) The person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

(b) A person seeking enforcement of an instrument under subsection (a) of this section must prove the terms of the instrument and the person's right to enforce the instrument.  If that proof is made, section 28:3-308 applies to the case as if the person seeking

(continued…)

enforce the instrument." D.C. Code § 28:3-309 (b). Subsection (a) specifies three requirements for establishing an entitlement to enforce the instrument. First, the person seeking payment must either (A) have been entitled to enforce the instrument at the time possession was lost or (B) have acquired ownership from someone so entitled. D.C. Code § 28:3-309 (a)(1). Second, the loss of possession must not be the result of a transfer by the person seeking payment. D.C. Code § 28:3-309 (a)(2). Third, the person seeking payment must not be reasonably able to obtain possession of the instrument. D.C. Code § 28:3-309 (a)(3). The second and third requirements (non-transfer and unavailability of instrument) plainly do not impose any burden on the person seeking payment to prove that the instrument has not already been paid to a person entitled to enforce the instrument. Although the analysis is more complicated, we conclude that the same is true of the first requirement.

---

(…continued)

enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

In the present case, Mr. Bartel apparently relies on section 28:3-309 (a)(1)(A), which requires that he show that he was entitled to enforce the instrument when he lost possession of the instrument. Under D.C. Code § 28:3-301 (2012 Repl.), the phrase "person entitled to enforce" an instrument includes a holder of the instrument, a non-holder in possession of the instrument, and a person entitled to enforce the instrument under section 28:3-309. Under D.C. Code § 28:1-201 (20) (2012 Repl.), one way to qualify as a holder of a negotiable instrument is to be in possession of an instrument payable to the person. These provisions do not require Mr. Bartel to establish that the check at issue in this case has not already been paid.

Section 28:3-309 functions sensibly under this reading. Qualifying as a person entitled to enforce an instrument does not establish a right to payment of the instrument. Rather, the Bank in this case can avoid having to pay the cashier's check if the Bank can establish a defense to payment under D.C. Code § 28:3-308 (b) (2012 Repl.). Critically for current purposes, however, section 28:3-308 places the burden on the bank to prove any defense it may have. D.C. Code § 28:3-308 (b) (person entitled to enforce instrument is entitled to payment unless "the defendant proves a defense or claim in recoupment"). Moreover, prior payment of an instrument is generally treated as an affirmative defense. *See, e.g.,*

*Household Fin. Co. v. Watson*, 522 S.W. 2d 111, 114 & n.1 (Mo. Ct. App. 1975) ("Payment is an affirmative defense . . . ."); *Estate of Kosuga v. Rockstar Media, LLC*, No. 10. Civ. 6628(ER), 2013 WL 1268612, at *6 (S.D.N.Y. Mar. 28, 2013) ("[P]ayment is essentially an affirmative defense, of which the burden of proof rests on the party who pleads it."); *Lawrence's Anderson on the Uniform Commercial Code* § 3-603:28, Westlaw (3d ed. database updated Dec. 2014) ("Payment is an affirmative defense and the burden of proof is on the party asserting it."). We also note that section 28:3-309 (b) precludes the trial court from requiring payment of a lost instrument unless the person required to pay "is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means."[3]

For the foregoing reasons, we conclude that section 28:3-309 does not place a burden on Mr. Bartel to prove that the cashier's check has not previously been paid. We reach the same conclusion as to section 28:3-312, which provides an

---

[3] The Bank argues that it no longer has records that might shed light on whether the cashier's check has previously been paid, because it retains records for only seven years -- one year longer than is required under federal law. We do not view that circumstance as determinative of the burden-of-proof issue, although it is potentially relevant to one or more of the Bank's defenses.

alternative procedure, available in addition to the procedure established under section 28:3-309, to parties seeking payment of lost cashier's checks. D.C. Code § 28:3-312 (d). Under section 28:3-312's procedure, the claimant must demand payment from the bank. D.C. Code § 28:3-312 (b). Among other requirements, the demand must include a sworn declaration of loss. D.C. Code § 28:3-312 (b)(ii). The declaration of loss must state that "(i) the declarer lost possession of a check, (ii) the declarer is the . . . payee of the check, in the case of a cashier's check or teller's check, (iii) the loss of possession was not the result of a transfer by the declarer or a lawful seizure, and (iv) the declarer cannot reasonably obtain possession of the check . . . ." D.C. Code § 28:3-312 (a)(3). Subject to various timing requirements, a properly submitted claim becomes "enforceable." D.C. Code § 28:3-312 (b).

Once the claim is enforceable, "the obligated bank becomes obliged to pay the amount of the check to the claimant if payment of the check has not been made to a person entitled to enforce the check." D.C. Code § 28:3-312 (b)(4). This provision is not explicit about whether claimants or banks bear the burden of proof on the issue of prior payment. We conclude that the provision is better read as implicitly imposing the burden on banks. First, information about whether a check has already been paid will in general be more readily available to banks than to

claimants.  *See generally, e.g.*, *Riggs Nat'l Bank of Washington, D.C. v. District of Columbia*, 581 A.2d 1229, 1249-50 (D.C. 1990) (allocating burden of proof on issue to banks because, among other reasons, facts relevant to issue were "more likely to be within the knowledge of the bank") (brackets and internal quotation marks omitted).  Second, as we have already noted, the applicable statutory scheme treats comparable issues as matters of defense.  D.C. Code §§ 28:3-309, -308 (b).

In sum, we conclude that Mr. Bartel does not have the burden of proving that the cashier's check in this case has not already been paid.  We therefore disagree with the ground upon which the trial court granted summary judgment.  In this court, the bank raises several alternative contentions upon which it claims summary judgment could appropriately have been granted, such as that Mr. Bartel's declaration of loss under section 28:3-312 was deficient; that Mr. Bartel transferred the cashier's check to the McKinleys, thereby defeating his claim under both section 28:3-309 and section 28:3-312; and that Mr. Bartel's claim is barred by laches.  Mr. Bartel disputes those contentions.  The trial court did not resolve those issues, and we "exercise our discretion to leave [those] issue[s] for resolution by the trial court in the first instance." *Folks v. District of Columbia*, 93 A.3d 681, 686 (D.C. 2014).  *See generally, e.g.*, *Jaiyeola v. District of Columbia*, 40 A.3d 356, 372 (D.C. 2012) (although court has discretion to affirm grant of summary

judgment on alternative grounds not decided by trial court, court has "cautioned that it usually will be neither prudent nor appropriate for this court" to do so) (internal quotation marks omitted).

As the dissent notes, this court in some circumstances will affirm a trial court's ruling on alternative grounds not decided by the trial court. In our view, that approach is not warranted in this case. With respect to Mr. Bartel's request for relief under section 28:3-312, the dissent would affirm on the ground that Mr. Bartel's sworn declaration of loss was deficient in two respects, because the declaration failed to allege both (1) that Mr. Bartel lost possession of the check and (2) that the loss of possession was not the result of a transfer by Mr. Bartel. As to the first asserted deficiency, however, the Bank did not raise either in the trial court or in this court the specific argument that the declaration failed to allege loss of possession. Affirmance on that ground therefore would not be appropriate. *See, e.g.*, *Linen v. Lanford*, 945 A.2d 1173, 1180 n.4 (D.C. 2008) ("Generally speaking, matters not properly presented to a trial court will not be resolved on appeal.") (internal quotation marks omitted); *In re Shearin*, 764 A.2d 774, 778 (D.C. 2001) (points not raised on appeal "are treated as abandoned").

As to the second asserted deficiency, the Bank did argue that the declaration of loss was inadequate on the issue of transfer. In doing so, however, the Bank appears to have understood the declaration to have been supplemented by Mr. Bartel's sworn statements in response to interrogatories. Thus, as framed by the Bank, the question is whether the declaration and the response to interrogatories, taken together, were adequate on the issue of transfer. That question also arises under section 28:3-309, and we discuss that question on the merits briefly infra. But it would not be prudent or procedurally fair to affirm on the different ground, relied upon by the dissent, that the declaration must be considered in isolation and so considered is deficient. The Bank has not argued that the declaration must be considered in isolation, the parties have not briefed that issue, the trial court did not decide the issue, and the dissent does not explicitly address the issue.

With respect to Mr. Bartel's request for relief under section 28:3-309, the dissent first concludes that the undisputed facts establish that Mr. Bartel transferred the check to the McKinleys. *See* D.C. Code §§ 28:3-309 (a)(2) (loss of possession must not be result of transfer). We do not share the dissent's confidence. As the dissent notes, "transfer" is defined as delivery "for the purpose of giving to the person receiving delivery the right to enforce the instrument." D.C. Code § 28:3-203 (a) (2012 Repl.). Although the dissent states that Mr. Bartel "delivered the

check to the McKinleys for the purpose of giving them the right to enforce it," Mr. Bartel indicated in a sworn statement that he did not intend the McKinleys to have any authority over the check other than to hold it until its return or until the contemplated transaction was consummated. The dissent asserts that delivery under such circumstances should still be viewed as a "transfer." The dissent cites no case so holding, however, relying instead on an illustration in a report by the Permanent Editorial Board of the Uniform Commercial Code that neither party cited and that addresses the use of a note as security. *See* Permanent Editorial Bd. for the Unif. Commercial Code, *Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes* 11 (2011) (stating that if borrower delivers mortgage note to provider of funds, as security, provider of funds would be entitled to enforce note *if* delivery of note constituted transfer of note). The illustration poses rather than answers the question whether delivery of a mortgage note in such circumstances would be a transfer. *Id.* Moreover, the illustration does not discuss section 28:3-309 or address shared possession of a cashier's check among co-payees. *Id.* We also observe that the dissent does not fully respond to Mr. Bartel's arguments as to why giving a cashier's check to another payee for safekeeping and possible future negotiation should not be viewed as a transfer. We are not inclined to reach out to decide an uncertain question of apparent first

impression in the absence of a ruling by the trial court and fuller briefing by the parties.

Second, the dissent concludes that Mr. Bartel failed to establish a material dispute of fact as to whether he was entitled to enforce the check at the time he lost possession, because the check at some point might have been endorsed by the McKinleys so as to permit a third party to enforce the check. This issue too seems far from settled. For one thing, it is unclear to us when Mr. Bartel lost possession of the check, and the dissent does not explicitly address that question. Mr. Bartel presumably lost actual possession of the check when the check was put in the McKinleys' safe, and no one has suggested that the McKinleys had endorsed the check at that point. It is less clear, however, for how long, if at all, Mr. Bartel thereafter had constructive possession of the check. Nor is obvious whether constructive possession counts as possession for purposes of section 28:3-309.

In any event, we think it unclear that Mr. Bartel failed to raise a material dispute of fact on the question whether the McKinleys endorsed the check before Mr. Bartel lost possession of the check. According to Mr. Bartel, (1) he obtained the check with his own funds; (2) he entrusted the check to the McKinleys'

safekeeping in the hope that the check would become consideration for a business transaction; (3) the transaction never occurred; (4) he unsuccessfully demanded return of the check; (5) he has no information that the check was endorsed to a third party or presented to a bank for payment; (6) various searches failed to locate the check; and (7) an analysis of the McKinleys' financial records showed no transaction suggesting that the McKinleys presented the check for payment or endorsed the check to a third party in exchange for payment. Such evidence would not be dispositive, but the dissent does not explain why a reasonable factfinder could not infer by a preponderance of the evidence that the McKinleys did not violate their alleged agreement with Mr. Bartel by negotiating the check before Mr. Bartel lost possession of the check. *Cf. Ruby v. Farmers Mut. Auto. Ins. Co.*, 79 N.W.2d 644, 645-48 (Wis. 1956) (although insurance policy provided that mysterious disappearance of property would presumed to be due to theft, circumstantial evidence supported trial court's inference that property at issue was lost rather than stolen); *cf. generally, e.g.*, *Schwab v. Reilly*, 560 U.S. 770, 790 (2010) (noting "the presumption that parties act lawfully"); *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 350 (9th Cir. 2014) ("Both California and federal law assume that people act lawfully unless proven otherwise.").

As the dissent points out, Mr. Bartel stated in his reply brief that the McKinleys had the right to alienate the check. We do not understand that statement, however, as a concession that Mr. Bartel would have had no legal complaint against the McKinleys had they negotiated the check contrary to the alleged agreement between Mr. Bartel and the McKinleys. More generally, whether it would have been wrongful for the McKinleys to negotiate the check under the alleged circumstances of this case seems yet another issue better left for consideration in the first instance by the trial court.

The dissent further points out that checks "do not disappear out of safes into thin air." It does not follow, however, that the check in this case must have been negotiated by the McKinleys, because -- among other possibilities -- checks can be inadvertently removed from safes and lost or misplaced.

Finally, we note that the dissent repeatedly suggests that Mr. Bartel bears the burden under section 28:3-309 of showing that the check was never endorsed by the McKinleys. That too seems unclear at best. It is true that section 28:3-309 (a) requires a claimant to establish that he or she "is entitled to enforce the instrument." But the provision further indicates that a claimant may meet that

requirement by showing (1) an entitlement to enforce the instrument at the time the claimant lost possession of the instrument, (2) that the loss of possession was not the result of transfer by the claimant or lawful seizure; and (3) that the claimant is unable to obtain possession of the instrument. D.C. Code § 28:3-309 (a). On its face, at least, the provision focuses on a claimant's right of enforcement at the time the claimant loses possession of the instrument, not at the time the instrument later cannot be found by anyone or at the time the claimant brings suit. The provision thus does not appear to place on a claimant the very difficult task of proving what happened to the instrument after the claimant lost possession of the instrument.

In sum, we are not inclined to affirm the trial court's denial of relief under sections 28:3-309 and 28:3-312 on the alternative grounds relied upon by the dissent.

Accordingly, the judgment of the Superior Court is reversed and the case is remanded for further proceedings.

*So ordered.*

THOMPSON, *Associate Judge*, dissenting: I see no reason why we should drag out this litigation through a remand when, on the summary judgment record that is before us, we are able to conclude as a matter of law that appellant Bartel is not entitled to recover under either of the statutory provisions on which he relies: D.C. Code §§ 28:3-312 and 28:3-309 (2012 Repl. & Supp. 2014).[1] To explain why we are able to do so, I begin with a summary of the facts that adds some important details to the summary set out in the majority opinion.

On March 9, 1994, Mr. Bartel purchased a cashier's check in the amount of $30,761.00 from NationsBank, the predecessor of Bank of America N.A. (the "Bank").[2] The check was made payable to the order of "Dana McKinley or Edna McKinley or Richard Bartel." In his summary judgment papers, Mr. Bartel explained that, from "shortly after its issuance," the check was in the possession of Dana McKinley; it was "intended to be [Mr. Bartel's] consideration for a contemplated later business transaction between the McKinleys and [Mr. Bartel]."

---

[1] The provisions of D.C. Code Title 28, Subtitle I contain the Uniform Commercial Code ("UCC") as adopted in the District of Columbia. *See* D.C. Code § 28:1-101 (2012 Repl.).

[2] Mr. Bartel brought the instant action against appellee Bank of America Corporation, which asserted in its answer that the Bank is "the sole proper party defendant." However, appellee did not raise this as an issue in its brief in this appeal.

Specifically, Mr. Bartel "sought for the McKinleys to sell their shares of Eclipse Holdings, Inc. [a company of which Mr. Bartel was a majority shareholder] back to the company treasury." Dana McKinley and Mr. Bartel "personally placed the check in [the McKinley's fireproof] safe in 1994[.]" The McKinleys "refused to consummate the intended business transaction[,]" but Mr. Bartel "nevertheless left the funds with Dana McKinley with hope that they would come to an agreement later." The transaction that Mr. Bartel hoped for never occurred.

Mr. Bartel eventually made demands for return of the check in "numerous emails, telephone calls, and personal visits to Dana." According to Mr. Bartel, Dana McKinley ("Dana") told him that he "never touched or moved the check" and that "the check was never removed from his house," but also stated at some point that the safe could not be opened because either he had fumbled a change in the combination or "his Guardian had changed the combination." The guardian had been appointed in 2008 because Dana was suffering from "deteriorating mental illness." At some point, the guardian had the safe drilled open, and the cashier's check was not found.

Edna McKinley ("Edna") died in April 2008, having at some point prior to that time become "blind and immobile." The record does not disclose at what point Edna became blind and immobile, but, according to Mr. Bartel, he and the Mckinleys (i.e., *both* Edna and Dana) "continued to work together for several years" after the McKinleys declined to sell their Eclipse Holdings stock. Further, although averring that Dana stated that he "never touched or moved the check," Mr. Bartel made no reference to any equivalent representation by Edna.

Mr. Bartel stated in a May 2008 email that Rene McKinley (Dana's sister and Edna's daughter) had access to the McKinley safe "years ago" through "a combination given to her by a friend of Edna's, William Sharrar."

Dana McKinley died in September 2011. The cashier's check was not listed on either Dana's or Edna's estate inventory, and the representatives of the estates reported that, after diligent efforts, they could find no evidence that the check was deposited into an account belonging to either.[3]

---

[3] Mr. Bartel requested that the Bank research the check. The Bank responded that it had no record of escheatment of the funds corresponding to the check amount. In addition, Mr. Bartel sent an inquiry to the office of the

(continued…)

Mr. Bartel asserts that he had "no information indicating to [him] that the cashier's check was lost until the inventory of Dana McKinley's estate in 2013." On July 29, 2013, he wrote to the Bank, attaching a copy of the check, making what he labeled a "declaration of loss," and demanding payment. The Bank declined to honor his demand for payment. It explained that, in compliance with federal law, it keeps its records, including records of predecessor banks, for a period of seven years, which exceeds the record-retention period required under federal law.[4] The Bank asserts that it has no records of the check and has been unable to "locate any information related to the Check."[5]

---

(…continued)
Comptroller of Maryland, the State in which the check was issued, which office reported that it had no record of unclaimed funds relating to the check.

[4] *See* 12 U.S.C. § 1829b (g) (2012) (providing that "[a]ny type of record or evidence required under this section [entitled "Retention of records by insured depository institutions"] shall be retained for such period as the Secretary may prescribe for the type in question" but that "[a] period so prescribed shall not exceed six years unless the Secretary determines . . . that a longer period is necessary in the case of a particular type of record or evidence").

[5] The Bank asserted in an opposition to Mr. Bartel's motion for summary judgment that it "is extremely likely that one of the other payees negotiated the instrument years ago and that record of the transaction has since been destroyed as per BofA's policies and procedures."

On August 23, 2013 — more than 19 years after the cashier's check was issued by the Bank's predecessor — Mr. Bartel brought suit against appellee for the check amount of $30,761.00, asserting claims under Article 3 of the UCC. He argued in his summary judgment papers that, on the undisputed facts, he satisfies the requirements of § 28:3-312 ("§ 3-312") (entitled "Lost, destroyed, or stolen cashier's check, teller's check, or certified check") or, "alternatively," the requirements of § 28:3-309 ("§ 3-909") (entitled "Enforcement of lost, destroyed, or stolen instrument"). The appeal presents issues of statutory construction, as to which our review is *de novo*.

The summary judgment record enables us to conclude that Mr. Bartel does not satisfy the requirements of § 28:3-312. Section 3-312 creates an obligation for a bank (the "obligated bank") to pay the amount of a cashier's check to a "claimant" who declares, *in a declaration of loss that comports with the requirements set out in the statute*, that the check was lost, destroyed, or stolen. § 3-312 (b)(4). To comply with § 3-312 with respect to a cashier's check, a declaration of loss must state under penalty of perjury "to the effect" that:

> (i) the declarer lost possession of a check,
>
> (ii) the declarer is the . . . remitter [i.e., purchaser] or
> payee of the check . . .

> (iii) the loss of possession was not the result of a transfer by the declarer or a lawful seizure, and
>
> (iv) the declarer cannot reasonably obtain possession of the check because the check was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

§ 3-312 (a)(3).

Mr. Bartel states that his "demand of July 29, 2013 . . . satisfie[d] the definition of a "declaration of loss[.]"[6]   However, quite clearly, his purported declaration of loss was missing some of the statutorily required elements.  It does not state, under penalty of perjury or otherwise, that "the declarer lost possession of a check."  Nor does it state that "the loss of possession was not the result of a transfer by the declarer or a lawful seizure" (and, as discussed below, Mr. Bartel stated to the contrary, in a sworn interrogatory response, that he gave the check to the McKinleys to pay them for the (anticipated) sale of certain stock to Mr.

---

[6]   He has never argued that his demand letter plus his interrogatories or something else together constitute his declaration of loss.

Bartel).[7]  In short, the purported declaration of loss did not strictly comply with § 3-312 (a)(3).[8]

Just as clearly, the summary judgment record shows that Mr. Bartel cannot satisfy the requirements of § 3-309.  Section 3-309 (a), entitled "Enforcement of lost, destroyed, or stolen instrument," provides that:

> (a) A person not in possession of an instrument is entitled to enforce the instrument if:
>
> > (1) the person seeking to enforce the instrument . . . [w]as entitled to enforce the instrument when loss of possession occurred . . .
> >
> > (2) [t]he loss of possession was not the result of a transfer by the person or a lawful seizure; and

---

[7] Further, Mr. Bartel did not assert in his Complaint that the loss of possession was not the result of a transfer. *Cf. Hirsch v. Wells Fargo Bank,* No. 1:13-cv-01489, 2014 U.S. Dist. LEXIS 29587, *6 (N.D. Ohio Mar. 7, 2014) ("[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." (quoting *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39, 42 (6th Cir. 1988) (further citation omitted)).

[8] Because a declaration of loss that complies with § 3-312 (a)(3) creates an obligation for the bank that issued the cashier's check to pay the check, *see* § 3-312 (b)(4), and because the obligated bank "may not impose additional requirements on the claimant," U.C.C. § 3-312 cmt. 2, strict compliance with the elements of § 3-312 (a)(3) is required.

(3) [t]he person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

(b) A person seeking enforcement of an instrument under subsection (a) of this section must prove the terms of the instrument and the person's right to enforce the instrument. . . .

Thus, to prevail under § 3-309, Mr. Bartel must prove that "[t]he loss of possession [of the cashier's check] was not the result of a transfer by the person." Per D.C. Code § 28:3-203 (a), an instrument is "transferred" "when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Mr. Bartel acknowledges that he handed over possession of the cashier's check to the McKinleys, named payees, in anticipation that they would accept the check as consideration for the sale of their shares of stock in Eclipse Holdings, Inc. In other words, he voluntarily and purposely delivered the check to the McKinleys for the purpose of giving them the right to enforce it.[9] This undisputed fact alone is enough to defeat Mr. Bartel's

---

[9] The McKinleys did not already have the right to enforce the instrument simply by virtue of the fact that they were named payees. To have a right to enforce the check, they needed to be (or to have been) in possession of the instrument. *See* D.C. Code § 28:3-301 (2012 Repl.) (providing that "person

(continued…)

claim. The fact that his intent to enable the McKinleys to enforce the check was contingent upon their agreement to the stock sale, and the fact that Mr. Bartel had a right to demand the return of the check or the purchase price if the sale did not occur, do not negate the fact that he made a transfer that rendered him unable to satisfy § 3-309 (a)(2).[10]  *See* 6B Ronald A. Anderson, *Anderson on the Uniform*

---

(…continued)

entitled to enforce" means "the holder of the instrument"); D.C. Code § 28:1-201(21) (2012 Repl. & Supp. 2014) (providing that in the case of an instrument made payable to an identified person, the "holder" is that "identified person" if (s)he "is the person in possession"); Gregory E. Maggs, *Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions*, 36 B.C. L. Rev. 619, 649 (July 1995) ("[A] person who does not have possession of an instrument generally cannot enforce it.").

I recognize that Mr. Bartel has asserted in his sworn interrogatory responses that he placed the check in the McKinleys' safe "for safekeeping," but, even if fully credited, that statement does not negate Mr. Bartel's further sworn assertion that by delivering to the McKinleys the check payable to either of them, he gave them the authority to enforce the check, albeit in contemplation of their coming "to an accord regarding the[] sale" of their stock to Mr. Bartel.

[10]  This is consistent with the guidance provided by the Permanent Editorial Board of the Uniform Commercial Code (the "UCC Board").  In a report that courts have cited numerous times as elucidating the application of Article 3 of the UCC, the UCC Board contemplates that if the Payee of a note borrows money from a lender ("Funder") and gives possession of the note (which, like a cashier's check, is a negotiable instrument) to the Funder to secure the Payee's repayment obligation, the delivery of the note from Payee to Funder can constitute "a transfer of the note under UCC § 3-203" even though the Funder's right to enforce its security interest in the note is contingent upon Payee's default on its repayment obligation.  Report of the Permanent Editorial Board for the Uniform Commercial Code, "Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes," at 11 (November 14, 2011) (the "Report"); *see also, e.g.*,

(continued…)

*Commercial Code* § 3-309:5, p. 261 (3d ed. 1998) ("The fact that the plaintiff would be able to . . . set aside a transfer because of fraud or other reason does not remove the bar imposed by . . . § 3-309 of having made a voluntary transfer."). Mr. Bartel's transfer to the McKinleys "vest[ed] in the[m as] transferee[s] any right of [Mr. Bartel as] transferor to enforce the instrument." D.C. Code § 28:3-203 (b).

Mr. Bartel also cannot prove through competent evidence that he has the right to enforce the instrument, § 3-309 (b), or that he had that right "when loss of

---

(…continued)
*(Darlene) Brown v. Dep't of Commerce*, 359 P.3d 771, 778 (Wash. 2015) (en banc) (citing the Report as "authoritative"); *Skelton v. Urban Trust Bank*, 516 B.R. 396, 404 (Bankr. N.D. Tex. 2014) (applying the Report's guidance on "transfers" under the UCC); *Mandalay Resort Group v. Miller (In re Miller)*, 310 B.R. 185, 191 n.11 (Bankr. C.D. Cal. 2004) (explaining that UCC Article III "negotiable instruments include [*inter alia*] promissory notes, [and] cashier's checks").

Moreover, to conclude that there was no transfer within the meaning of D.C. Code § 28:3-203 (a) because of circumstances related to the anticipated business deal would contravene the general scheme of Article 3 of the U.C.C., which is to make it unnecessary to "delve into the contractual relationships of named payees[.]" *Cf. American Nat'l Ins. Co. v. Citibank*, 543 F.3d 907, 910 (7th Cir. 2008); *see also id.* at 909-10 ("Instead of being able to look at the payee line and to verify that the person presenting the check was indeed entitled to do so, banks in ANICO's world would need to conduct a full-blown investigation every time to make sure that a party with an equitable interest in the check was not lurking in the background. Such a system would bring commercial transactions to a grinding halt.").

possession occurred[.]" § 3-309 (a)(1).[11] As Judge Kravitz recognized, Mr. Bartel was "handicapped in meeting [his] burden because [the McKinleys] died before the complaint was filed and [as far as the record shows, their] testimony was not preserved in a deposition[,]" *Hamilton v. Howard Univ*., 960 A.2d 308, 318 (D.C. 2008), and because anything Dana told Mr. Bartel about the check would be inadmissible hearsay. While Mr. Bartel might be able to call Dana's guardian, or the McKinleys' estate representatives, or other witnesses to testify that the check was not found in the safe and that they found no evidence of a deposit of the cashier's check amount into either of the McKinleys' bank accounts, that evidence would have been relevant only to whether the McKinleys continued to possess the check at the time of their deaths, or whether they deposited the cashier's check during a period for which their records or bank records are extant.[12] Moreover,

---

[11] A person seeking to enforce an instrument under § 3-309 has the burden of proving "the terms of the instrument" and the person's "right to enforce the instrument." § 3-309 (b). Since one of the terms of the instrument is the payee, *see, e.g.*, *Yahn & McDonnell, Inc. v. Farmers Bank of Delaware*, 708 F.2d 104, 109 (3d Cir. 1983), "right to enforce the instrument" must mean something more than status as one of the alternative named payees.

[12] Mr. Bartel stated in a June 2009 email that the check had not been cashed "since 1999" – presumably the earliest date covered by the McKinleys' existing bank records. That leaves five years prior to 1999 as to which Mr. Bartel has come forward with no competent evidence accounting for the status or disposition of the check. Yet, "[v]irtually all [cashier's checks] are presented for payment within 90 days" after the date of issuance. U.C.C. § 3-312 cmt. 3.

such testimony would not have addressed, e.g., whether either of the McKinleys negotiated the check in some other way,[13] such as (as appellee suggests) by endorsing it and "transfer[ring] it to a third party holder in due course." If either of them did transfer the check, the transfer "vest[ed] in the transferee any right of the transferor to enforce the instrument[,]" D.C. Code § 28:3-203 (b) ("§ 3-203 (b)"), and thus divested the named payees — including Mr. Bartel — of any right to enforce the instrument.[14] *Cf. Cadle Co. v. Proulx*, 725 A.2d 670, 672 (N.H. 1999) (citing New Hampshire's version of § 3-203 (b) and holding that plaintiff's transfer of a note "divested [plaintiff] of the right to enforce the note in a court proceeding"); *United States Bank, N.A. v. Ugrin*, 91 A.3d 924, 930 (Conn. App. Ct. 2014) ("If an endorsement makes a note payable to an identifiable person, it is a 'special endorsement,' and only the identified person in possession of the instrument is entitled to enforce the instrument."). The same result follows if

---

[13] Per D.C. Code 28:3-201 (a), "'[n]egotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." "Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone." *Id.*, § 3-201 (b).

[14] Under D.C. Code § 28:3-110 (d) (2012 Repl.), "[i]f an instrument [like the one at issue in this case] is payable to 2 or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument."

either of the McKinleys endorsed the cashier's check in blank and it thereafter fell into the hands of a third person,[15] becoming payable to that person and extinguishing any right Mr. Bartel had to enforce the instrument. *See* D.C. Code § 28:3-109 (c) (2012 Repl.) (providing that "[a]n instrument payable to an identified person may become payable to bearer if it is indorsed in blank pursuant to section 28:3-205 (b)"); D.C. Code 28:3-205 (b) (2012 Repl.) ("When indorsed in blank [i.e. indorsed without identifying a person to whom it is made payable], an instrument becomes payable to bearer and may be negotiated by transfer of possession alone[.]"). As to these possibilities, the record contains only hearsay evidence (e.g., Mr. Bartel's statement that Dana told him that he "never touched or moved the check"). "Such hearsay evidence is insufficient to create a genuine issue of material fact" and thus to avoid summary judgment. *(Carla) Brown v. Argenbright Sec., Inc*., 782 A.2d 752, 760 (D.C. 2001).[16]

---

[15] As described above, the record suggests that at least two "third persons" — Rene McKinley and William Sharrar — had the combination to the safe.

[16] The foregoing issues — whether Mr. Bartel's purported declaration of loss was legally sufficient and whether Mr. Bartel can prove that his loss of possession of the check was not the result of a transfer and that he was entitled to enforce the check at the time it was lost — were raised by appellee in the trial court and before us, and Mr. Bartel has had a full opportunity to brief the issues. An additional issue — and, in my view, an additional reason why summary judgment in favor of appellee was warranted — relates to the requirement that a claimant seeking to enforce an instrument under § 3-312 (a)(3)(i) must have been in

(continued…)

Mr. Bartel argues that the Bank should bear the burden of proving (as an affirmative defense) that the check was already paid.  That may be so (and I do not disagree with my colleagues on this point), but the point I make is that the Bank's burden is not triggered unless Mr. Bartel first shows that he was entitled to enforce the instrument when loss of possession occurred (and, as already discussed, that he did not lose possession of the check as a result of a transfer).  At the summary judgment stage, having told the court repeatedly (in successive motions for summary judgment) that the matter was ripe for decision on the summary

---

(…continued)

possession of the instrument at the time it became "lost."  It appears that Mr. Bartel cannot satisfy this requirement either, because if the check was "lost," it became lost not while it was in Mr. Bartel's possession, but after it was delivered to Dana and placed in the Bartels' safe.  *Cf. Seman v. First State Bank*, 394 N.W.2d 557, 558-59, 560 (Minn. Ct. App. 1986) (recounting that Seman purchased from the bank a cashier's check that named as payee his former employee Evans, who was to use the money to buy Seman a car, and that after Seman gave Evans the check, he learned that Evans was a drug addict and was going to use the money to purchase drugs, and thereafter asked the bank to stop payment on the check; reasoning that the check was not "lost," because "the purchaser himself had delivered the check to the named payee").  However, since the parties have not briefed or argued the issue as to when the check became "lost," I do not rely on this additional basis.

I note that even if we assume that Mr. Bartel had (joint) constructive possession of the check in the safe, he still cannot prove that he lost it.  If it was cashed or negotiated by one of the  alternative payees, it was not lost.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. Allstate Ins. Co*., 29 F. Supp. 2d 1129, 1145 (C.D. Cal. 1998) ("The instrument in question was not lost . . . — it was cashed.").

judgment record, Mr. Bartel failed to come forward with sufficient competent evidence to meet his burden of proof.

There is a dearth of evidence about what the McKinleys might have done with the check in the years between 1994 and the years of their declining health and deaths (in 2008 and 2011). Mr. Bartel does not aver that Edna never touched or moved the check (although he made such an averment as to Dana). In addition, as Mr. Bartel himself explained, at some point during those many years, others (relative Renee McKinley and friend William Sharrar) had the combination (and, it can reasonably be assumed, access) to the McKinleys' safe. Because items do not disappear out of safes into thin air, it is more likely than not (if not certain) that someone removed the check from the safe. To conclude that it is more likely than not (or as likely as not) that the check was removed from the safe and negotiated, it is not necessary, as the majority opinion appears to suggest, to assume that the check was wrongfully negotiated by one of the McKinleys, or that they or anyone else acted or intended to act unlawfully. As Mr. Bartel acknowledges in his Reply Brief, the McKinleys, as named payees, had an "indisputable *right* to alienate the check" (emphasis added). One of the McKinleys might lawfully have endorsed

and negotiated or cashed the check,[17] fully intending to return the amount of the check to Mr. Bartel upon demand. Or, to give another example, one of the McKinleys might have (lawfully) endorsed the check in blank, making it a bearer instrument and giving a third party who came into possession of the check a right under the law to enforce it. *See* D.C. Code § 28:3-301 ("A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument."); *Collins v. Gilbert*, 94 U.S. 753, 754 (1877) (describing the presumption that "[p]ossession of . . . an instrument . . . indorsed in blank, is prima facie evidence that the holder is the proper owner and lawful possessor of the same"); *One West Bank, F.S.B. v. Bauer*, 159 So. 3d 843, 844 (Fla. Dist. Ct. App. 2d Dist. 2014) ("Because [the bank] possessed the original [negotiable instrument], endorsed in blank, it was the lawful holder of the note entitled to enforce its terms.").

---

[17] By leaving with the McKinleys a check payable to the order of either of them, Mr. Bartel made it possible and lawful for either of them to do so; Mr. Bartel's action rendered the McKinleys, as payees, holders in possession "entitled to enforce [the] instrument." D.C. Code § 28:3-301; *see also* D.C. Code § 28:1-201 (21) (providing that a "holder" is "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession"). I believe we can reasonably infer that what underlies the requirement in §§ 3-309 and 3-312 that a claimant seeking to recover on a "lost" negotiable instrument prove (in the case of § 3-309) or aver (in the case of § 3-312) that he did not transfer the instrument is a presumption that the transferee *will* cash or negotiate the instrument.

It is far from clear that the presumption on which the majority opinion relies — a presumption that people act lawfully, *ante* at 15 — would apply in the UCC Article III context, given the many references in the official comments to theft, forgery, and fraudulent allegations of loss. *See, e.g.*, comments 2 and 3 to § 3-312; *see also (Darlene) Brown,* note 10 *supra*, 359 P.2d at 779 (noting that the UCC Article III rule about who is entitled to enforce an instrument, such as a mortgage note, "focuses on the party who possesses the note in order to protect the borrower from being sued fraudulently or by multiple parties on the same note"). But even if it is assumed that our jurisdiction would apply a general presumption that people act lawfully and would also do so in the UCC Article III context, that presumption would not negate or overcome the presumption under the law pertaining to negotiable instruments, applied in the cases cited at the end of the preceding paragraph, that a person in possession of an instrument made payable to that person or to the bearer may *lawfully* enforce that instrument.[18]  Thus, the

---

[18] And, unlike in *Ruby v. Farmers Mut. Auto Ins. Co.,* 79 N.W.2d 644 (Wis. 1956), cited in the majority opinion, the facts alleged by Mr. Bartel do not weigh in favor of an inference of "loss."  In *Ruby*, involving the plaintiff's claim against the insurer for the value of a large diamond that went missing from a gemstone ring, the court rejected the "presumption of theft" described in the insurance policy because the "preponderance of the credible evidence [including evidence that no one was known to have had access to the ring in the place where the plaintiff last
(continued…)

presumption the majority opinion invokes does not assist Mr. Bartel in meeting his burden of proof as to his entitlement to enforce the check.

The record does not enable us to say what happened to the check, but what is clear on the record before us is that Mr. Bartel cannot prove by a preponderance of competent evidence a critical element of his § 3-309 claim: that *he* retained entitlement to enforce the check at the time it allegedly was lost.[19] A jury would have to speculate in order to return a verdict for Mr. Bartel. For that reason, Judge Kravitz did not err in granting summary judgment with respect to Mr. Bartel's § 3-309 claim. *See McFarland v. George Washington Univ.*, 935 A.2d 337, 361 (D.C.

_____

(…continued)

saw it, and evidence that the ring contained two smaller diamonds that were not disturbed] . . . indicate[d] to a reasonable certainty that a theft did not take place." *Id*. at 648. There is no such preponderance of evidence here, as at least two people in addition to the McKinleys had the combination to the safe where the cashier's check was stored. As the rule against hearsay dictates, there also is no presumption that Dana McKinley spoke truthfully, accurately, and with a sound mind when, as Mr. Bartel claims, he told Bartel that he had not touched the check.

[19] Mr. Bartel was required to come forward with "competent evidence admissible at trial" to avoid summary judgment. *Sanchez v. Magafan*, 892 A.2d 1130, 1132 (D.C. 2006); *see also Nader v. de Toledano*, 408 A.2d 31, 48 (D.C. 1979) ("Summary judgment should be granted to the movant unless the opposing party offers competent evidence admissible at trial showing that there is a genuine issue as to a material fact."). He was not entitled to wait until trial to develop or present the necessary evidence. *See Aziken v. District of Columbia*, 70 A.3d 213, 223 (D.C. 2013).

2007) (Because "a jury would have to speculate in order to find [the requisite] causal link[, . . . the court] properly granted . . . judgment as a matter of law.").

My colleagues in the majority have elected to "exercise our discretion to leave [those] issue[s] for resolution by the trial court in the first instance" (quoting *Folks v. District of Columbia*, 93 A.3d 681, 686 (D.C. 2014), and they rely on case law "caution[ing] that it usually will be neither prudent nor appropriate for this court" to affirm a grant of summary judgment on alternative grounds not decided by the trial court. *Ante* at 10 (citing *Jaiyeola v. District of Columbia*, 40 A.3d 356, 372 (D.C. 2012)). However, in *Folks*, the proposed alternative basis for summary judgment turned on whether the plaintiff had provided sufficient evidence that the defendants had acted negligently, and we relied on authority holding that issues of negligence are inappropriate for resolution on summary judgment. 93 A.3d at 686 (citing *Crawford v. Katz*, 32 A.3d 418, 435-436 (D.C. 2011) (brackets omitted). In *Jaiyeola*, the posture was that trial court had not considered "whether appellant genuinely needed to depose his former supervisor and obtain other discovery" in order to try to establish a prima facie case of discrimination, 40 A.3d at 372, and we treated the case as one where "the issues are not ripe for consideration, not clearly presented by the record or . . . it would be better to leave to the trial court

the task of sifting through the summary judgment record." *Id.* at 373 (quoting

*Franco v. District of Columbia*, 3 A.3d 300, 307 (D.C. 2010)).

Given the record in this case — no one contends that additional discovery is

needed, the issues were clearly presented below, the record is not voluminous, the

issue is not negligence or any other basis on which summary judgment "should be

granted sparingly,"[20] and the issues are ones of statutory construction — I think the

more pertinent case authority can be found in this court's recent decision in *Stone*

*v. Landis Constr. Co.*, 120 A.3d 1287 (D.C. 2015):

> In the absence of procedural unfairness, we may affirm a
> judgment on any valid ground, even if that ground was
> not relied upon by the trial judge. The requirement of
> procedural fairness is satisfied here, since the parties
> have fully briefed and argued th[e] substantive
> question[s].

*Id.* at 1289 n.6 (internal quotation marks and citations omitted); *see also Grimes v.*

*District of Columbia*, 89 A.3d 107, 112 n.3 (D.C. 2014) (rejecting the trial court's

rationale for dismissal of a retaliation claim, but affirming the dismissal on the

alternative ground, reasoning that there was "no unfairness in affirming on the

---

[20] *William J. Davis, Inc. v. Tuxedo LLC*, 2015 D.C. App. LEXIS 454, *31 (D.C. Sept. 24, 2015) (internal quotation marks omitted).

[alternative] ground [that the complaint failed to state a DCHRA retaliation claim] . . ., because [appellant] briefed that issue in this court and in the trial court").

For the foregoing reasons, I would affirm the judgment of the Superior Court in favor of appellee, on the ground that, on the undisputed factual record, appellant failed to satisfy the requirements of § 3-312 or § 3-309.[21]  I respectfully dissent from the judgment remanding the case for further proceedings.

---

[21]  I emphasize that my dissent is based on Mr. Bartel's inability to satisfy the statutory requirements of §§ 3-309 and 3-312, not on any lack of sympathy for his circumstance.  I note that these UCC provisions "supplement" rather than displace other "principles of law and equity,"  D.C. Code § 28: 1-103 (b) (2012 Repl.), meaning that they were no bar to Mr. Bartel's pursuing other possible (litigation or non-litigation) remedies, including the claims for unjust enrichment and conversion that he also made in his Complaint.  (On appeal, however, he has not challenged the trial court's ruling that he failed to make out a *prima facie* case on his unjust enrichment and conversion claims.)  I also note that while at least one court has expressed an inclination to waive or bend the technical requirements of § 3-309 where there is little or no "risk that [the defendant] will ultimately be prejudiced by plaintiff's lack of due diligence," *A.I. Credit Corp v. Gohres*, 299 F. Supp. 2d 1156, 1160 (D. Nev. 2004), that circumstance is not presented here.  If the Bank or its predecessor did pay the cashier's check (as many as 21 years ago), no bond or other security will keep the Bank from being "forced to pay . . . twice" (the "primary concern with regard to enforcement of a missing [negotiable instrument") if it is required to pay Mr. Bartel.  *Id.*